**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KENNETH HOWARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. 08-90J** |
| | ) |
| **BLALOCK ELECTRIC SERVICE,** | ) **JUDGE GIBSON** |
| **INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on a motion for summary judgment filed by the Defendant, Blalock Electric Service, Inc. ("Blalock Electric"), pursuant to Federal Rule of Civil Procedure 56. Def.'s Mot. for Summ. J. The Plaintiff, Kenneth Howard ("Howard"), opposes the motion for summary judgment. Pl.'s Br. For the reasons that follow, the Motion for Summary Judgment will be granted in part and denied in part.

### II. BACKGROUND

Blalock Electric is owned by Larry Blalock ("Blalock"). Pl.'s Resp. to Def.'s Statement of Facts at ¶ 2. Howard is a black male who was born on July 22, 1958. Howard Dep. at 5. Blalock Electric maintains a policy prohibiting its employees from harassing or discriminating against other employees. Pl.'s Resp. to Def.'s Statement of Facts at ¶ 5. Howard began working as an electrician for Blalock Electric on July 18, 2001. Pl.'s Statement of Facts at ¶ 1. He was laid off on February

1

1, 2002. Pl.'s Resp. to Def.'s Statement of Facts at ¶ 6.

In November 2004, Howard was rehired by Blalock Electric. *Id.* at ¶ 7. Upon his return, he was assigned to work at Somerset High School ("Somerset") for approximately $32.00 per hour. Pl.'s Statement of Facts at ¶¶ 4-5. Howard worked at Somerset until May 2005, when he was assigned to work at the United Cerebral Palsy ("UCP") Building in Johnstown, Pennsylvania. Pl.'s Resp. to Def.'s Statement of Facts at ¶ 8. The project manager at the UCP site was Glenn Coposky ("Coposky"). *Id.* at ¶ 11. While working at the UCP site, Howard was sometimes reluctant to perform certain tasks because of his inexperience. *Id.* at ¶ 13.

Shortly after his reassignment to the UCP site, Howard began to experience tensions with some of his co-workers. One of those co-workers was a white male named Richard Bishop ("Bishop"), who also worked at the UCP site. Pl.'s Statement of Facts at ¶ 59. On one occasion, Bishop walked by Howard and spit some tobacco onto his pant leg. *Id.* at ¶ 22. When confronted by Coposky, Bishop acknowledged that he had spit tobacco onto Howard's pant leg. *Id.* at ¶ 26. Bishop also activated a battery-operated reciprocating saw near Howard and said, "I should fucking kill you." *Id.* at ¶¶ 32, 39. Coposky reprimanded Bishop and told him not to "screw around" while working. *Id.* at ¶ 36. No formal disciplinary action was taken against Bishop in connection with these incidents. *Id.* at ¶ 42.

Bishop continued to evince hostility toward Howard. Bishop apparently stated that he would kill Howard if he could get away with it, and that he would refrain from doing so only because he did not want to go to jail. *Id.* at ¶ 31. He referred to Howard as a "fucking nigger" when making that comment. *Id.* at ¶ 27. On a separate occasion, Bishop stated that he wanted to "stick" Howard with "a needle full of heroine." *Id.* at ¶ 28. Bishop also said that he and his co-workers should "hook"

2

Howard up to a "primary," which was the high-voltage side of a transformer, in order to electrocute him. *Id.* at ¶¶ 50-51. In addition, Bishop insinuated that he was a member of the Ku Klux Klan ("KKK") by telling his co-workers to come to work wearing "white sheets," and to be ready to "make gallows." *Id.* at ¶¶ 47-48.

Mark Petak ("Petak"), a white male employed by Blalock Electric, was also assigned to work at the UCP site in May 2005. *Id.* at ¶ 67. Petak's father-in-law was Blalock's uncle. *Id.* at ¶ 66. Howard and Petak apparently did not get along. Petak told Coposky that he did not want to work with "that f'ing black nigger." *Id.* at ¶ 73. Howard informed Coposky that he could not tolerate Petak's attitude. *Id.* at ¶ 75. Coposky responded by saying that Howard and Petak would no longer be required to work together. *Id.*

Coposky kept a gun in the vehicle that he used to drive to work. *Id.* at ¶ 94. This vehicle was parked at the UCP site during the course of a typical workday. *Id.* Coposky sometimes used the term "nigger-rigged" when referring to something that had been put together in a "half-assed" manner. *Id.* at ¶¶ 65, 92. During a meeting with Blalock and Kephart conducted in Blalock's office, Coposky admitted that he had used that term. *Id.* at ¶ 92.

Howard contacted Blalock on June 7, 2005, and requested a meeting to discuss the harassment that he was experiencing while working. *Id.* at ¶ 95. A meeting was held at 4:15 P.M. on June 8, 2005. *Id.* at ¶ 96. Howard, Balock and Kephart were present for the meeting. *Id.* Howard described his previous encounters with Bishop and Petak. *Id.* at ¶ 98. He also complained about Coposky's use of the term "nigger-rigged." *Id.* at ¶ 106. Blalock mentioned that a Confederate flag was displayed on Bishop's pickup truck. *Id.* at ¶ 97. Howard told Blalock and Kephart that he feared for his safety. *Id.* at ¶ 103.

3

On June 9, 2005, Coposky met with Blalock and Kephart to discuss the situation. *Id.* at ¶ 118. After the meeting, Coposky informed the other employees working at the UCP site about Howard's complaints. *Id.* at ¶ 123. He told them that they had better "straighten up." *Id.* at ¶ 122. Later that afternoon, Bishop made comments about coming to work dressed as a member of the KKK and "sticking" Howard with "a needle filled with heroine." *Id.* at ¶ 125.

At the end of a typical workday, the employees would place their hard hats into a "gang box" that contained expensive tools owned by Blalock Electric. *Id.* at ¶ 126. The gang box was locked in order to prevent the theft of valuable materials. *Id.* Bishop possessed a key that could be used to open the gang box. *Id.* at ¶ 129. When Howard arrived for work on the morning of June 10, 2005, he discovered that someone had written "Rat 2" on his hard hat. *Id.* at ¶ 130. Howard complained about the matter to Coposky, who sarcastically replied, "It's a hard hat." *Id.* at ¶¶ 133-134.

At approximately 9:00 A.M., shortly after speaking with Coposky, Howard went to Kephart's office, showed her that someone had written "Rat 2" on his hard hat, and asked for a transfer to a different job location. *Id.* at ¶¶ 143-144, 146. Howard asked to speak with Blalock, who was in his office at the time, but Blalock did not speak with Howard on that occasion. *Id.* at ¶¶ 147-148. Howard told Kephart that he was returning to his home, and that he did not believe that it was safe for him to go back to the UCP site. *Id.* at ¶ 149. When he got home, Howard telephoned Blalock's office and was told that Blalock was not available.[1] *Id.* at ¶ 158.

During the course of the ensuing week, Howard repeatedly tried to contact Blalock in order

---

[1] Blalock testified that he had spoken with Howard on June 10, 2005. Blalock Dep. at 73-79. Howard testified that, after leaving the UCP site and speaking with Kephart, he had not spoken with Blalock until June 16, 2005. Howard Dep. at 81-82. At this stage, the Court must view the testimonial evidence in the light most favorable to Howard. *Gilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007).

4

to request a transfer to a different job location. *Id.* at ¶¶ 179-184, 193. Howard and Blalock finally talked with each other on June 16, 2005. *Id.* at ¶ 194. Blalock informed Howard that his unilateral decision to abandon his duties had been construed and treated by Blalock Electric as a voluntary resignation. *Id.* at ¶ 195. Howard argued that he had simply been waiting to be reassigned to a location other than the UCP site. *Id.* at ¶ 196. When Howard went to Blalock Electric's office on June 17, 2005, to pick up his paycheck, he denied that he had voluntarily terminated his employment relationship with Blalock Electric. *Id.* at ¶ 198.

Howard filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") on August 30, 2005, alleging violations of the Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951 *et seq.*]. Compl. at ¶ 6. The complaint was dual-filed with the Equal Employment Opportunity Commission ("EEOC") in order to preserve Howard's remedies under Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*]. *Id.* On February 20, 2008, Howard asked the PHRC to dismiss his case, thereby enabling him to pursue remedies that were not available under the PHRA. *Id.* at ¶ 7. The EEOC issued a "right to sue" letter to Howard on March 17, 2008. *Id.* at ¶ 8.

Howard commenced this action against Blalock Electric on April 9, 2008, alleging that he had been subjected to discrimination and retaliation in violation of Title VII, the PHRA and 42 U.S.C. § 1981. *Id.* at ¶¶ 43-69. Blalock Electric filed a motion for summary judgment on September 30, 2009. Def.'s Mot. for Summ. J. That motion is the subject of this memorandum opinion.

### III. STANDARD OF REVIEW

Summary judgment may only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and

5

that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* Pursuant to Federal Rule of Civil Procedure 56(c), the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the non-moving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the non-moving party's burden of proof. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324. The non-moving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV. JURISDICTION AND VENUE

The Court has jurisdiction over Howard's federal claims pursuant to 28 U.S.C. § 1331 and

6

42 U.S.C. § 2000e-5(f)(3). Supplemental jurisdiction over his PHRA claims is predicated on 28

U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Howard's complaint contains nine counts. In Counts I, II and III, Howard alleges that he was

subjected to a "hostile work environment" because of his race, in violation of Title VII, § 1981 and

the PHRA. Compl. at ¶¶ 43-51. In Counts IV, V and VI, he contends that he was "discharged"

because of his race, in violation of those same statutory provisions. *Id.* at ¶¶ 52-60. In Counts VII,

VIII and IX, he asserts retaliation claims under Title VII, § 1981 and the PHRA, arguing that he was

"discharged" in retaliation for his "opposition" to race-based discrimination. *Id.* at ¶¶ 61-69.

### A.    The Race-Based Discrimination Claims

Title VII's anti-discrimination provision is codified at 42 U.S.C. § 2000e-2(a), which

provides:

> **§ 2000e-2. Unlawful employment practices**
> **(a) Employer practices.** It shall be an unlawful employment practice for an employer--
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). During the period of time relevant to this case, Blalock Electric was an

"employer" subject to Title VII's provisions, and Howard was an "employee" entitled to statutory

protection from race-based discrimination. 42 U.S.C. § 2000e(b), (f).

The PHRA declares it to be an "unlawful discriminatory practice" "[f]or any employer, because of the race [or] color . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 PA. STAT. § 955(a). Although the PHRA is a statute of independent force under Pennsylvania law, it has generally been construed to be coextensive with its federal counterparts. *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996). The provisions of the PHRA are typically construed to be coterminous with parallel federal anti-discrimination provisions unless a difference in the applicable statutory language indicates that a different construction is warranted.

*Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

Howard also asserts claims under The Civil Rights Act, which provides:

**§ 1981. Equal rights under the law**
**(a) Statement of equal rights.** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
**(b) "Make and enforce contracts" defined.** For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
**(c) Protection against impairment.** The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. The United States Court of Appeals for the Third Circuit has stated that, in the

employment context, the "substantive elements" of a discrimination claim under § 1981 are "generally identical" to those of a discrimination claim under Title VII.[2] *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-182 (3d Cir. 2009). Because the scope of protection provided under the PHRA and § 1981 is not materially different from that provided under Title VII, the Court's analysis of Howard's Title VII claims will be similarly applicable to his claims under the PHRA and § 1981.

### 1. The "Hostile Work Environment" Claims

Title VII's anti-discrimination provision provides that it is an "unlawful employment practice" for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63-69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court recognized that an employer *discriminates* against an employee *because of his or her sex* when it engages in sex-based harassment that is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment. The holding in *Meritor Savings Bank* applies with equal force to harassment based on an individual's race, color, religion or national

---

[2] Prior to 1991, only the language presently codified at 42 U.S.C. § 1981(a) was contained within § 1981. In *Patterson v. McLean Credit Union*, 491 U.S. 164, 171, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the United States Supreme Court held that § 1981 did not proscribe discriminatory conduct occurring after the formation of a contract and having no impact on an individual's ability to enforce established contractual obligations. Congress responded to the decision in *Patterson* by enacting § 101 of the Civil Rights Act of 1991, which added subsections (b) and (c) to § 1981. Pub. L. No. 102-166, § 101; 105 Stat. 1071, 1072 (1991). In light of the statutory amendment, the term "make and enforce contracts" is broad enough to encompass "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). By expanding the definition of the term "make and enforce contracts," Congress "enlarged the category of conduct that is subject to § 1981 liability." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 303, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). Since an employment relationship constitutes a "contractual relationship" within the meaning of subsection (b), race-based employment discrimination that violates Title VII also violates § 1981. *Schurr v. Resorts International Hotel, Inc.*, 196 F.3d 486, 498-499 (3d Cir. 1999).

9

origin. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 276, n. 5 (3d Cir. 2001). Harassment which does not alter the "terms, conditions, or privileges" of one's employment, however reprehensible it may be, does not run afoul of Title VII. *Meritor Savings Bank*, 477 U.S. at 67. An isolated incident amounts to a change in the "terms, conditions, or privileges" of one's employment only if it is "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Title VII's anti-discrimination provision prohibits only those forms of discriminatory harassment that are severe or pervasive enough to create a hostile or abusive working environment.[3] *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

The inquiry as to whether an employee's working environment is sufficiently hostile or abusive to constitute a violation of Title VII encompasses both objective and subjective components. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22. This test, which is not "mathematically precise," accounts for all relevant factors. *Id.* at 22. "Such factors include, but are not limited to, whether the alleged discriminatory

---

[3] Race-based "hostile work environment" claims are cognizable under § 1981, since harassment that is severe enough to alter the "terms, conditions, or privileges" of one's employment within the meaning of Title VII is also severe enough to affect the "benefits, privileges, terms, and conditions of the contractual relationship" between the employee and his or her employer within the meaning of § 1981. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004).

harassment is frequent, whether it is severe, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance." *Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 419 (W.D.Pa. 2010), citing *Harris*, 510 U.S. at 23.

When he was deposed, Howard described the events supporting his "hostile work environment" claims. He explained that, on one occasion, Bishop had spit some tobacco onto his pant leg. Howard Dep. at 57. According to Howard, this incident occurred at some point during his first two weeks at the UCP site. *Id.* at 58. Howard stated that "hindsight" led him to believe that Bishop's actions had been racially motivated. *Id.* at 57. He apparently reported the incident to Coposky, but no formal discipline was imposed on Bishop. *Id.* at 58.

Howard testified that he had also been mistreated by Petak. *Id.* at 60. According to Howard, Petak told Coposky that he would not work with "that f'ing black nigger." *Id.* Coposky allegedly shrugged his shoulders and walked away. *Id.* at 61. After Howard indicated that he could no longer tolerate Petak's attitude, Coposky separated Howard and Petak, preventing them from working together. *Id.*

The Blalock Electric employees working at the UCP site generally ate their lunches inside of a trailer located nearby. Howard testified that he would often hear some of his co-workers making racially motivated comments about him while he was smoking cigarettes outside of the trailer. *Id.* at 62-63. He accused Petak of calling him "a fucking nigger," and he attributed other derogatory statements to Bishop. *Id.* at 63. Howard described Bishop as "a very threatening person." *Id.* at 65. According to Howard, Bishop stated that he would "kill that fucking nigger" if he could "get away with it," that he would "stick" Howard with "a needle full of heroine," and that he would come to

11

work dressed in an outfit akin to those typically worn by members of the KKK. *Id.* On a separate occasion, Petak allegedly stated that he wanted to run over some "fucking niggers" who had walked in front of his vehicle. *Id.* at 67. Howard declared that Coposky had been present while many of these comments were being made. *Id.* at 66. In addition, Howard explained that Coposky had sometimes used the term "nigger-rigged" to describe projects that had not been completed properly. *Id.* at 68.

Howard also gave testimony concerning a separate incident involving Bishop. On that occasion, Bishop allegedly activated a battery-operated reciprocating saw close to Howard and said, "I should fucking kill you." *Id.* at 69. Howard testified that Bishop had "smirkingly laughed and walked away" after being asked what he was doing. *Id.* Howard stated that he had told Coposky about the incident, but that no action had been taken against Bishop. *Id.* at 69-70. Howard further explained that he had stopped putting in overtime hours because of concerns that his hostile co-workers would harm him when nobody else was around. *Id.* at 74. This concern was magnified because Coposky was known to keep a gun inside of his vehicle. *Id.* at 75.

Because of the ongoing harassment that he was experiencing, Howard met with Blalock and Kephart during the afternoon hours of June 8, 2005. *Id.* at 71. When he arrived for work the next day, Coposky was not there. *Id.* Coposky arrived at the UCP site later than usual. *Id.* at 73. He apparently arrived on the scene late because he had been meeting with Blalock and Kephart about Howard's complaints. Howard testified that he had seen "Rat 2" written on his hard hat upon his arrival for work on the morning of June 10, 2005. *Id.* at 75-76. He showed it to Coposky, who sarcastically replied, "It's a hard hat." *Id.* at 76. At that point, Howard telephoned a friend of his, who drove him to Kephart's office. *Id.* at 78-79. Howard testified that it had not been "safe" for him

12

to continue working at the UCP site. *Id.* at 100.

Barry Parks ("Parks") worked with Howard at the UCP site. Parks testified that, on one occasion, Bishop had stated that he should "hook [Howard] up to a primary" while he was standing on top of a ladder, so that "the voltage would travel through the conduit" and electrocute him. Parks Dep. at 7. These statements were allegedly made by Bishop inside of the trailer during a lunch break. *Id.* Parks explained that Bishop had made those comments while Howard was standing on the landing of the steps leading to the inside of the trailer, and that Bishop had intended for Howard to hear what was being said. *Id.* at 7-8. According to Parks, Coposky "laughed" in response to Bishop's remarks. *Id.* at 8. Parks also explained that Bishop had suggested that he and his co-workers should come to work "wearing white sheets," and that they should be prepared to make "gallows." *Id.* at 9. Parks further testified that he had been subjected to harassing comments by Bishop after agreeing to give Howard a ride to and from work. *Id.* at 22-23. Moreover, Parks declared that there had been legitimate reasons for Howard to fear for his safety while working at the UCP site. *Id.* at 27. He indicated that Coposky's response to Howard's complaints had been insufficient to alleviate the threat to Howard's welfare. *Id.*

Coposky testified that Petak was "a grumpy old man" with whom nobody had wanted to work. Coposky Dep. at 9. He also stated that many Balock Electric employees had complained to him about Howard's performance, claiming that they had been forced to redo much of his work. *Id.* at 10. According to Coposky, he separated Bishop and Howard after Bishop had admitted to spitting tobacco onto Howard's pant leg. *Id.* at 17. Coposky further testified that Bishop had admitted to pointing a reciprocating saw in Howard's direction and turning it on. *Id.* at 18. Coposky allegedly told Bishop to "quit pissing around on the job." *Id.* at 19. He acknowledged that he had taken no

13

formal disciplinary actions against Bishop. *Id.* Coposky also acknowledged that other Blalock Electric employees had repeatedly referred to Howard as a "nigger" because of their distaste for him. *Id.* at 20.

The writing on Howard's hard hat was discussed during Coposky's deposition. Coposky described the incident as "child's play," contending that he had not taken the matter seriously because the project at the UCP site had fallen behind schedule. *Id.* at 30-31. He stated that someone had once written "Rat 5" on his hard hat, and that the similar words or phrases had been written on hard hats worn by other Blalock Electric employees. *Id.* at 43-45. Coposky could not specifically remember whether Howard had expressed safety-related concerns. *Id.* at 50. Nevertheless, he acknowledged that he had kept a gun inside of his vehicle during the relevant period of time. *Id.* at 53. Coposky explained that he typically carried a gun "everywhere." *Id.*

Blalock testified that he had addressed the concerns expressed by Howard on June 8, 2005, by speaking with Coposky the next day. Blalock Dep. at 46. Coposky apparently told Blalock that Bishop had activated reciprocating saws on several different occasions while standing close to other employees. *Id.* at 47. Blalock was content to let Coposky informally address the matter by chastising Bishop. *Id.* at 51. According to Blalock, Bishop had been known to display a Confederate flag on his pickup truck. *Id.* at 67-68. Blalock relayed this information to Howard during the meeting of June 8, 2005. *Id.*

Blalock Electric argues that Howard cannot establish that the harassment which he endured was sufficiently "severe or pervasive" to adversely affect the "terms, conditions, or privileges" of his employment. Def.'s Br. 6-11. At the outset, it must be noted that Howard need not show that the harassment was *both* severe *and* pervasive to proceed with his "hostile work environment"

14

claims. Instead, he need only demonstrate that a triable issue exists as to whether the harassment was *either* severe *or* pervasive. *Jensen v. Potter*, 435 F.3d 444, 449, n. 3 (3d Cir. 2006); *Watkins v. Nabisco Biscuit Co.*, 224 F.Supp.2d 852, 864, n. 19 (D.N.J. 2002). After all, an "isolated incident" of harassment can be actionable under Title VII if it is "extremely serious." *Faragher*, 524 U.S. at 788. For instance, a single instance of rape can alone constitute actionable sex-based discrimination. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967-968 (9th Cir. 2001). On the other hand, less severe incidents do not violate Title VII if they are relatively "few in number." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000). In other words, the more "severe" harassing acts are, the less "pervasive" they have to be to constitute an actionable violation of Title VII. *Id.*; *Carrero v. New York City Housing Authority*, 890 F.2d 569, 578 (2d Cir. 1989) ("The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive."). Where no "serious" or "severe" incidents occur, an individual "cannot rely upon casual, isolated, or sporadic incidents" to advance a "hostile work environment" claim. *Harris v. Smithkline Beecham*, 27 F.Supp.2d 569, 578 (E.D.Pa. 1998). This is especially true where the only acts of harassment alleged are verbal utterances of racial epithets. *McCloud v. United Parcel Service, Inc.*, 543 F.Supp.2d 391, 399 (E.D.Pa. 2008) (observing that "isolated, sporadic incidents of racially or sexually charged comments do not constitute 'severe or pervasive' conduct that is actionable under Title VII").

The record clearly contains evidence that Howard subjectively perceived his work environment to be sufficiently hostile to adversely impact his ability to work effectively. During his meeting with Blalock and Kephart, Howard indicated that he did not feel safe working at the UCP site. Howard Dep. at 67. Howard also testified that he had stopped putting in overtime hours

15

because of fears that his co-workers would attack him. *Id.* at 75. It is undisputed that Howard left the UCP site shortly after discovering that somebody had written "Rat 2" on his hard hat. In light of this evidence, Howard has satisfied the subjective component of the "hostile work environment" analysis.

Blalock Electric claims that Howard cannot proceed with his claims in the absence of evidence that his work environment adversely affected his "psychological stability." Def.'s Br. 6. However, the Supreme Court squarely rejected this argument in *Harris*. Speaking through Justice O'Connor, the Supreme Court declared that "concrete psychological harm" is *not* an element of a "hostile work environment" claim under Title VII. *Harris*, 510 U.S. at 22. Of course, psychological harm to an individual resulting from harassing conduct is a factor that can be considered in determining whether an individual's work environment is sufficiently hostile or abusive to be actionable. *Id.* at 22-23. It does not follow, however, that harassing conduct *must* impact an individual's "psychological stability" in order to run afoul of Title VII. *Id.* As the Supreme Court explained in *Harris*, "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22. Where harassment adversely affects the "terms, conditions, and privileges" of one's employment, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Id.*

It remains to be determined whether Howard can establish that an objectively reasonable individual in his position would have perceived his work environment to be hostile or abusive. In conducting this inquiry, the Court is mindful that "[t]he real social impact of workplace behavior

16

often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed" in a given situation. *Oncale*, 523 U.S. at 81-82. Therefore, the objective component of the "hostile work environment" analysis must be considered with "an appropriate sensitivity to social context." *Id.* at 82.

A careful review of the record reveals that a triable issue exists as to whether an objectively reasonable individual in Howard's position would have perceived his work environment to be hostile or abusive. First of all, Howard was subjected to multiple acts of harassment within a relatively short period of time. This is a factor which weighs in his favor. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010). Another factor weighing in favor of Howard's position is the "severity" of the harassing conduct. *Harris*, 510 U.S. at 23. He was repeatedly referred to as a "nigger." Racial epithets of this kind can sometimes affect an individual's work environment even when they are not accompanied by additional forms of harassment. *Taylor v. Metzger*, 706 A.2d 685, 690-691 (N.J. 1998). In this case, however, the racial slurs allegedly uttered by Petak and Bishop were accompanied by "physically threatening" behavior.[4] *Harris*, 510 U.S. at 23. The record contains testimonial evidence that Bishop activated a reciprocating saw in close proximity to Howard and intimated that he wanted to kill him. Howard Dep. at 69. Bishop is also alleged to have verbally discussed electrocuting Howard, injecting Howard with heroine, and coming to work dressed in

---

[4] It is of no moment that Bishop and Petak may not have subjectively intended to physically harm Howard, or that their racially-motivated statements may not have constituted true "threats." In this context, what matters is how their statements would have been perceived or understood by an objectively reasonable person in Howard's position. *Venter v. Potter*, 694 F.Supp.2d 412, 429-432 (W.D.Pa. 2010). The "physically threatening" and "humiliating" comments allegedly made by Bishop and Petak cannot be fairly characterized as only "offensive utterances." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

"white sheets" like those typically worn by members of the KKK. "The mere mention of the KKK invokes a long and violent history sufficient to detrimentally affect *any* reasonable person of the same race as [Howard]." *Dickerson v. State of New Jersey, Dept. of Human Services*, 767 F.Supp. 605, 616 (D.N.J. 1991) (emphasis in original). Because the harassing conduct prevented Howard from putting in overtime hours, prompted him to request a meeting with Blalock and Kephart, and ultimately caused him to leave the UCP site, it is at least arguable that such conduct would unreasonably interfere with the work performance of an objectively reasonable employee. *Harris*, 510 U.S. at 23.

Blalock Electric argues that Howard cannot rely on Bishop's act of spitting tobacco onto his pant leg to support his "hostile work environment" claims, since he did not perceive that incident to be racially motivated at the time of its occurrence. Def.'s Br. 7. This argument is manifestly unpersuasive. Howard testified that it was only "in hindsight" that he believed the spitting incident to have been racially motivated. Howard Dep. at 57. That does not mean, however, that the incident itself cannot be considered as a part of the "hostile work environment" inquiry. Howard is entitled to rely upon a "chain of inference" in order to establish that Bishop's act of spitting tobacco onto his pant leg was motivated by a race-based animus. *Oncale*, 523 U.S. at 80. The Court acknowledges that an employee who is *totally unaware* of harassing behavior cannot subjectively *perceive* such conduct to be hostile or abusive. *Cottril v. MFA, Inc.*, 443 F.3d 629, 636-638 (8th Cir. 2006). However, in the instant case, Howard *was* aware of the conduct *itself.* Instead, he merely had no reason to believe that it had been racially motivated until later, when he heard Bishop refer to him in a racially-disparaging manner. Bishop's act of spitting tobacco onto Howard's pant leg is undoubtedly relevant to the "hostile work environment" inquiry in this case. *Sanchez v. Standard*

18

*Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970) (observing that a plaintiff "may have precise knowledge of the facts concerning the 'unfair thing' done to him, yet not be fully aware of the employer's *motivation* for perpetrating the 'unfair thing'") (emphasis in original).

Viewing the evidence in the light most favorable to Howard, the Court is convinced that a triable issue exists as to whether an objectively reasonable person would have viewed Howard's work environment as hostile or abusive. The inquiry, however, does not end there. In order to proceed with his "hostile work environment" claims, Howard must demonstrate that Blalock Electric is vicariously liable for the harassment perpetrated by Bishop and Petak. Under Title VII, an employer is vicariously liable for an actionable "hostile work environment" created by "a supervisor with immediate (or successively higher) authority" over that employee, subject to an affirmative defense permitting the employer to avoid liability upon establishing, by a preponderance of the evidence, that it "exercised reasonable care to prevent and correct promptly" any harassing behavior, and that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer."[5] *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher*, 524 U.S. at 807. Nonetheless, where a "hostile work environment" results from harassment perpetrated by an employee's *co-workers*, "there is no presumption of employer liability or accompanying burden on the employer to establish an affirmative defense to liability." *Andreoli v. Gates*, 482 F.3d 641, 648 (3d Cir. 2007). Where the relevant harassment has been perpetrated by a co-worker rather than by a supervisor, "a plaintiff

---

[5] The affirmative defense is not available where a supervisor's harassment culminates in a tangible adverse employment action. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

must demonstrate that the employer failed to provide a reasonable avenue for complaint," or that the employer was aware of the harassment and nevertheless "failed to take appropriate remedial action." *Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d Cir. 2001). In this context, the employer's liability is direct liability for its own negligence rather than vicarious liability for the actions of a supervisor. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293, n. 5 (3d Cir. 1999); *Williamson v. City of Houston*, 148 F.3d 462, 465 (5th Cir. 1998); *Pierce v. Commonwealth Life Insurance Co.*, 40 F.3d 796, 804, n. 11 (6th Cir. 1994); *Hirschfeld v. New Mexico Corrections Dept.*, 916 F.2d 572, 577, n. 5 (10th Cir. 1990); *Hall v. Gus Construction Co., Inc.*, 842 F.2d 1010, 1015-1016 (8th Cir. 1988); *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1421-1422 (7th Cir. 1986).

Although the parties do not directly address this issue in their briefs, it is evident from the record that neither Bishop nor Petak can be fairly characterized as a supervisor. It is undisputed that both individuals were co-workers of Howard, and that they had no job-related authority over him. Therefore, Howard cannot hold Blalock Electric vicariously liable for the harassing conduct perpetrated by Bishop and Petak, even if it is assumed that such conduct was sufficiently hostile or abusive to adversely affect the "terms, conditions, or privileges" of Howard's employment. To hold Blalock Electric liable under a "hostile work environment" theory, Howard must show that Blalock Electric was *itself* negligent in failing to remedy the harassment. *Wilson v. Moulison North Corp.*, 691 F.Supp.2d 232, 236 (D.Me. 2010). Liability for negligence will exist where an employer "knew or should have known of harassment" and nevertheless "failed to take prompt remedial action." *Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 107 (3d Cir. 1994). On the other hand, "prompt and effective action" by an employer to remedy a "hostile work environment" will shield it from liability. *Id.* A remedial action that is "reasonably calculated to prevent further harassment"

satisfies an employer's duty of reasonable care even if, in retrospect, that action proves to have been ineffective in actually accomplishing that objective.[6] *Knabe v. Boury Corp.*, 114 F.3d 407, 411, n. 8 (3d Cir. 1997) ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law. On the other hand, it is possible that an action that proves to be ineffective in stopping the harassment may nevertheless be found reasonably calculated to prevent further harassment and therefore adequate.").

An employer's duty to take remedial action against harassing behavior is clearly triggered once the employer has *actual notice* that the harassment is occurring. *Priller v. Town of Smyrna*, 430 F.Supp.2d 371, 379-380 (D.Del. 2006). In the absence of actual notice, an employer is charged with *constructive notice* of harassing behavior where an employee provides "management level personnel" with enough information to raise a probability of harassment in the mind of an objectively reasonable employer, or where harassment is "so pervasive and open" that it is logical to presume that an objectively reasonable employer would have been aware of it. *Kunin*, 175 F.3d at 294. In *Huston v. Proctor & Gamble Paper Products Corp.*, 568 F.3d 100, 107-108 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit held that, for purposes of constructive notice, an employee's knowledge of the existence of harassment will be imputed to an employer only where the employee is "sufficiently senior in the employer's governing hierarchy" that such knowledge is important to his or her *general* managerial duties, or where the employee is *specifically* employed

---

[6] "Negligence" is typically defined as "the failure to observe, for the protection of another's interest, such care and precaution as the circumstances demand, or the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances." *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir. 1984); *Seaboard Coast Railroad Co. v. Griffis*, 381 So.2d 1063, 1065 (Fla.Dist.Ct.App. 1979). Howard must prove that Blalock Electric was *negligent* in failing to prevent the harassment that was being perpetrated by Bishop and Petak. *Huston v. Proctor & Gamble Paper Products Corp.*, 568 F.3d 100, 104-105 (3d Cir. 2009).

to deal with issues related to harassment. Speaking through Judge Smith, the Court of Appeals went on to make the following observations:

> We clarify that mere supervisory authority over the performance of work assignments by other co-workers is not, by itself, sufficient to qualify an employee for management level status. It is not uncommon for non-managerial co-workers to be organized into groups where one worker is designated to oversee the performance by others of a specific task. But to the extent that such a supervisor does not have a mandate generally to regulate the workplace environment, that supervisor does not qualify as management level.

*Huston*, 568 F.3d at 108. The Court of Appeals further declared that an employer cannot be expected to know about every instance of harassment perpetrated by one of its employees, since the applicable standard was one of "negligence" rather than one of "strict liability." *Id.*

The observations made by the Court of Appeals in *Huston* suggest that an employee must have some "authority to affect the employment status" of others in order to qualify as a "management level" employee. *Id.* at 108. This narrow category of individuals does not include those who, while possessing a limited degree of responsibility for overseeing a particular task, have no authority to hire, fire or discipline subordinate employees. *Id.* at 108-109; *Wilson*, 691 F.Supp.2d at 236-237. When asked whether he had disciplined Bishop in response to Howard's complaints, Coposky testified that it had not been his place to issue formal reprimands. Coposky Dep. at 12-13. Coposky explained that he had simply told Bishop and Howard to avoid contact with each other after hearing Howard's complaints. *Id.* at 16-17. In addition, Coposky stated that he had not reported Bishop's transgressions to Blalock prior to Howard's meeting with Blalock and Kephart on June 8, 2005. *Id.* at 16. The record contains no indication that Coposky was specifically expected to deal with issues related to workplace harassment prior to his own meeting with Blalock and Kephart on June 9, 2005. Consequently, Blalock Electric had neither actual notice nor constructive notice of the ongoing

22

harassment prior to June 7, 2005, when Howard requested a meeting with Blalock to discuss the situation. Howard Dep. at 66, 70.

The negligence standard must be applied with a specific focus on "the timing and nature" of an employer's response to complaints of job-related harassment. *Andreoli*, 482 F.3d at 644. In this case, the window of time at issue is very short. Howard first complained about race-based harassment on June 7, 2005, when he requested a meeting with Blalock to discuss the work environment at the UCP site. Howard Dep. at 66, 70. A meeting was held at 4:15 P.M. on June 8, 2005, to address Howard's concerns. Blalock Dep. at 66. Howard, Blalock and Kephart were present for the meeting. *Id.* Howard relayed his concerns to Blalock and Kephart during the course of the meeting. Howard Dep. at 67-68. Blalock and Kephart met with Coposky on the morning of June 9, 2005, in order to discuss Howard's complaints. Blalock Dep. at 57-60. Kephart placed a written reprimand in Coposky's personnel file concerning his admitted use of the term "nigger-rigged." Coposky Dep. at 26. After the meeting, Coposky admonished the Blalock Electric employees working at the UCP site that a meeting had been conducted, and that on-the-job harassment would not be tolerated. *Id.* at 25. On the morning of June 10, 2005, Howard arrived at work and discovered that someone had written "Rat 2" on his hard hat. Howard Dep. at 76. Howard called the matter to Coposky's attention, but Coposky viewed it as a joke rather than as a problem that he needed to address. Coposky Dep. at 28. When Howard showed Coposky his hard hat and asked what was going on, Coposky sarcastically replied, "It's a hard hat." *Id.* at 30.

The evidentiary record contains some conflicts concerning exactly what happened next. Coposky testified that Howard had expressed an intention to "quit" after hearing Coposky's sarcastic statement. *Id.* Howard telephoned a friend, who subsequently picked him up and drove him to

23

Kephart's office. Howard Dep. at 78-79. Howard testified that he had spoken to Kephart, showed her the defaced hard hat, asked to speak with Blalock, and requested a transfer to a different work location. Howard Dep. at 79. He explained that he had not discussed this with Blalock because Kephart had told him that Blalock was not available. *Id.* According to Howard, he never told Kephart that he wanted to "quit." *Id.* at 80.

Kephart testified on April 9, 2009, that she could not recall whether Howard had expressed an intention to "quit" his job with Balock Electric on June 10, 2005. Kephart Dep. at 64, 70. Nevertheless, in a verified statement signed on December 5, 2005, Kephart declared:

On the morning of June 10, 2005, less than 2 full days after hearing Mr. Howard's concerns, I met Ken in the hallway of our office. Asked him what he was doing here and why he wasn't on the job working and he stated he quit and could no longer work on that job.

Verified Statement of Michelle Kephart. Although Kephart used the word "quit" in her statement, the phrase "on that job" could be read to indicate that Howard had only expressed an intention not to return to the UCP site rather than an intention to terminate his employment relationship with Blalock Electric altogether.

June 10, 2005, was a Friday. Howard testified that he had attempted to reach Blalock by telephone on that date, but that he had been told that Blalock was not available. Howard Dep. at 81. He stated that he had unsuccessfully attempted to contact Blalock on Monday, June 13, 2005, and each day thereafter until Thursday, June 16, 2005, when he finally spoke with Blalock. *Id.* According to Howard's deposition testimony, Blalock told Howard that his departure from the UCP site had been construed as a resignation. *Id.* at 82. Howard evidently tried to persuade Blalock to transfer him to a different work location, denying that he had resigned. *Id.* Howard further testified

24

that Blalock had refused his request for a transfer. *Id.*

Blalock described a different course of events in his deposition testimony. Blalock testified that he had spoken with Howard by telephone on June 10, 2005, and that Howard had stated that he could no longer work for the "company." Blalock Dep. at 77-79. According to Blalock, Howard did not request a transfer to a different work location until the following week, at which point Blalock was not willing to let Howard reconsider his decision to "quit." *Id.* at 80. The decision to deny Howard the opportunity to continue working for Blalock Electric was allegedly conveyed to Howard by Kephart. *Id.* at 80-81. Blalock denied that he had spoken with Howard subsequent to June 10, 2005. *Id.* at 81.

At this stage, the testimonial evidence must be viewed in the light most favorable to Howard. *Moore v. Darlington Township*, 690 F.Supp.2d 378, 397 (W.D.Pa. 2010). Accordingly, the Court's analysis must proceed on the assumption that Howard did not express an intention to resign when he spoke with Kephart on June 10, 2005, that he did not speak with Blalock on that date, that he repeatedly attempted to talk to Blalock about a reassignment throughout the ensuing six days, and that he first learned of his termination on June 16, 2005. Given Howard's testimony that he did not resign, taken in a light most favorable to the nonmoving party, the termination of his employment relationship with Blalock Electric must be treated (at this stage) as a "discharge."[7] *Prise v. Alderwoods Group, Inc.*, 657 F.Supp.2d 564, 589-591 (W.D.Pa. 2009).

---

[7] In order to establish that he was "constructively discharged," Howard would need to show that his working conditions had become "so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). A constructive discharge claim entails "something more" than an ordinary discriminatory discharge claim. *Id.* In this case, however, Howard appears to argue that he did *not* resign. Pl.'s Br. 10. Therefore, the termination of his employment relationship with Blalock Electric must be viewed (at least at this stage) as an ordinary discharge rather than as a constructive discharge.

Although Blalock promptly spoke with Coposky after meeting with Howard and Kephart, he acknowledged that nothing was done about the situation after Howard had left the UCP site on June 10, 2005. Blalock Dep. at 95. Bishop was never asked to explain his prior conduct. *Id.* at 94. Blalock did not check to see if Howard's request for a reassignment could be accommodated. *Id.* at 142. In light of the ongoing harassment that Howard had endured, the Court cannot conclude as a matter of law that Howard had no reason to view the "Rat 2" notation on his hard hat as a threat to his safety. After all, this incident occurred less than twenty-four hours after Coposky had informed the employees at the UCP site of Howard's complaints. Admittedly, there is some evidence which undermines Howard's assertion that he had a legitimate reason to fear for his safety. Coposky testified that it was not uncommon for Blalock Electric employees to write on other employees' hard hats, and that someone had once written "Rat 5" on his hard hat. Coposky Dep. at 28, 43-45. Michael Ellis ("Ellis"), a black employee of Blalock Electric, testified that the word "Rat" had been written on hard hats other than the one belonging to Howard. Ellis Dep. at 23-24. Nevertheless, Parks testified that Howard's safety-related concerns had been reasonable in light of what had been going on at the UCP site. Parks Dep. at 27. Viewing the evidence in the light most favorable to Howard, the Court is convinced that a reasonable trier of fact could conclude that Blalock Electric failed to take "prompt and adequate remedial action" after Howard complained of ongoing harassment. *Andreoli*, 482 F.3d at 649. Therefore, Blalock Electric's motion for summary judgment will be denied with respect to Howard's "hostile work environment" claims under Title VII, § 1981 and the PHRA. Compl. at ¶¶ 43-51.

## 2. The Discriminatory Discharge Claims

In Counts IV, V and VI of his complaint, Howard appears to assert that Blalock Electric violated Title VII, § 1981 and the PHRA by engaging in a more generalized form of race-based discrimination. Compl. at ¶¶ 52-60. Construing the evidence in a light most favorable to the nonmoving party, the Court must treat the termination of Howard's employment relationship with Blalock Electric as a "discharge"for purposes of the instant Motion.

Since this is an employment discrimination case in which no "direct evidence" of discrimination is presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide the formula for allocating the requisite burdens of proof and production for purposes of the instant motion for summary judgment.[8] In an employment discrimination case of this kind, the plaintiff must establish a *prima facie* case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802. If a *prima facie* case of discrimination is established, the defendant must articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an adverse manner. *Id.* at 802-803. If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination. *Id.* at 804-805. Evidence that an employer's stated reasons for an adverse

---

[8] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which "direct evidence" of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). The evidence presented in this case does not constitute "direct evidence" of discrimination.

employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253. In order to establish a *prima facie* case of discrimination, the plaintiff need only show that: (1) he or she was a member of a statutorily-protected class; (2) he or she was aggrieved by an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of illegal discrimination.[9] *Shah v. Bank of America*, 598 F.Supp.2d 596, 604 (D.Del. 2009). The specific elements of a *prima facie* case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis." *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999). The *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003). A *prima facie* case

---

[9] The Court recites these elements in a general manner in order to accommodate different factual scenarios. In a "discharge" or "failure-to-hire" case, the plaintiff's qualifications for the position at issue are often relevant at the *prima facie* stage. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008). This is because an inference of discrimination cannot be drawn where an employer discharges or refuses to hire an individual who is obviously unqualified for the desired position. For instance, no inference of sex-based discrimination can be drawn where a hospital seeking to employ a new surgeon chooses to hire a female physician rather than a male with no medical background. *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008). In that situation, consideration of the plaintiff's qualifications is appropriate at the *prima facie* stage, since deficient qualification is among the most common reasons relied upon by employers for declining to hire specific applicants for employment. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352 (3d Cir. 1999). In other instances, however, one's qualifications for a position may have nothing to do with the *prima facie* inquiry. Where the relevant adverse employment action is a suspension (or some other form of discipline which does not end an individual's employment relationship with his or her employer), the aggrieved employee's qualifications for his or her position are not likely to have any relevance at all to the *prima facie* inquiry. *Boykins v. Lucent Technologies, Inc.*, 78 F.Supp.2d 402, 409 (E.D.Pa. 2000). The three elements identified by the Court are generally relevant in *all* employment discrimination cases. All other issues at the *prima facie* stage are more accurately characterized as factors relevant to a more generalized inquiry as to whether a challenged employment action has occurred under circumstances giving rise to an inference of discrimination. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

"raises an inference of discrimination" sufficient to shift the burden of production to the defendant because the court presumes that certain actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Because the *prima facie* inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula." *Cobetto v. Wyeth Pharmaceuticals*, 619 F.Supp.2d 142, 153, n. 3 (W.D.Pa. 2007) (emphasis in original), citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 254-255. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis in original). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Id.*

If the defendant meets its burden of production, the dispositive factual issue is framed with

29

"sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-256. In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the *real reason* for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion. *St. Mary's Honor Center*, 509 U.S. at 519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (emphasis in original). Nevertheless, when coupled with a plaintiff's *prima facie* case, evidence that an employer's proffered reasons for an adverse employment action are false may sufficiently undermine the employer's credibility such that a reasonable trier of fact could conclude that illegal discrimination has occurred. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas-Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves*, 530 U.S. at 147. Circumstantial evidence is not only sufficient to sustain a finding of liability for intentional discrimination, "but may also be more certain, satisfying and persuasive than direct evidence."

30

*Desert Palace*, 539 U.S. at 100, quoting *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). Depending on the circumstances of the particular case at issue, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing "additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149. Whether summary judgment is warranted in a given case depends upon the strength of the plaintiff's *prima facie* case, the probative value of the evidence discrediting the defendant's proffered reasons for the challenged employment action, and the presence or absence of additional evidence that may properly be considered by a court in determining whether a judgment as a matter of law is appropriate. *Id.* at 148-149.

At the *prima facie* stage, the "central focus" is on whether an employer has treated an employee less favorably than others on the basis of an illicit discriminatory criterion. *Wilson v. Blockbuster, Inc.*, 571 F.Supp.2d 641, 647 (E.D.Pa. 2008). An inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action.[10] *Id.* In order to establish a *prima facie*

---

[10] Section 107 of the Civil Rights Act of 1991 amended Title VII to provide that, "[e]xcept as otherwise provided in [Title VII], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." Pub. L. No. 102-166, § 107; 105 Stat. 1071, 1075 (1991); 42 U.S.C. § 2000e-2(m). In light of the statutory amendment, which is codified at 42 U.S.C. § 2000e-2(m), a plaintiff can establish the existence of "discrimination" by showing that his or her race was a "motivating factor" in the challenged employment action. *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2349, 174 L.Ed.2d 119 (2009). In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 217-218 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit assumed that § 2000e-2(m) was applicable only where a plaintiff presents "direct evidence" of discrimination. The Supreme Court unanimously rejected that view in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), holding that, "[i]n order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" In the aftermath of *Desert Palace*, the application of § 2000e-2(m) can no longer be confined to the narrow category of Title VII cases involving "direct evidence" of discrimination. *Cobetto v. Wyeth Pharmaceuticals*, 619 F.Supp.2d 142, 154-158 (W.D.Pa. 2007). An employer able to show that it "would have taken the same action in the absence of the impermissible motivating factor" may avail itself of a partial affirmative defense permitting the granting of declaratory relief, injunctive relief, attorney's fees and costs but precluding an

case of discriminatory discharge, Howard must demonstrate that the circumstances surrounding his "discharge" give rise to an inference of race-based discrimination. *Terrell v. City of Harrisburg Police Department*, 549 F.Supp.2d 671, 681 (M.D.Pa. 2008). The most common way in which a plaintiff can establish a *prima facie* case of illegal discrimination is to show that he or she has received less favorable treatment than similarly situated employees who did not share his or her statutorily-protected trait. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352-357 (3d Cir. 1999).

Although the record contains evidence that Bishop and Petak were motivated by a race-based animus when they harassed Howard, the record is devoid of evidence permitting an inference that Blalock decided to "discharge" Howard because of his race. An individual can establish a violation of Title VII by showing that a decision rendered by an otherwise neutral decisionmaker has resulted from the taint of faulty evaluations or assessments supplied to the decisionmaker by a racially-motivated subordinate. *Qamhiyah v. Iowa State University of Science & Technology*, 566 F.3d 733, 742-745 (8th Cir. 2009); *Staub v. Proctor Hospital*, 560 F.3d 647, 651-659 (7th Cir. 2009); *Poland v. Chertoff*, 494 F.3d 1174, 1182-1183 (9th Cir. 2007); *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484-488 (10th Cir. 2006); *Roebuck v. Drexel University*, 852 F.2d 715, 727,

award of damages or the issuance of "an order requiring any admission, reinstatement, hiring, promotion, or payment." 42 U.S.C. § 2000e-5(g)(2)(B)(i)-(ii). The Court of Appeals recently noted that § 2000e-2(m) does not apply to claims arising under § 1981. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182, n. 5 (3d Cir. 2009). Thus, the standard of causation applicable under Title VII is not always identical to that applicable under § 1981. Nevertheless, the differences between Title VII and § 1981 with respect to the issue of causation do not impact the analysis at the *prima facie* stage, where the relevant question is whether a reasonable *inference* of race-based discrimination can be drawn. *Brown*, 581 F.3d at 182, n. 5 ("If race plays any role in a challenged decision by a defendant, the plain terms of the statutory text suggest that the plaintiff has made out a prima facie case that section 1981 was violated because the plaintiff has not enjoyed 'the same right' as other similarly situated persons. However, if the defendant then proves that the same decision would have been made regardless of the plaintiff's race, then the plaintiff has, in effect, enjoyed 'the same right' as similarly situated persons."). Therefore, there is no need for the Court to conduct separate inquiries at the *prima facie* stage.

32

734 (3d Cir. 1988). In this case, however, there is no evidence that Blalock was influenced by Bishop or Petak when he "terminated" Howard's employment with Blalock Electric.

Howard attempts to show that he was treated less favorably than two white employees named Jeffrey Freiwald ("Freiwald") and Ray Norman ("Norman"). Pl.'s Br. 16-18. Blalock Electric's internal documents indicate that Freiwald "quit" his job with Blalock Electric on September 25, 2003. Freiwald's Employee Notes, DEF 00091, DEF 00449. The next day, Freiwald described his decision to "quit" as a "mistake" and asked Blalock to let him continue working for Blalock Electric. *Id.* There is an inconsistency between two otherwise identical documents, one of which states that Blalock "would not" re-employ Freiwald and the other of which states that Blalock would "think about" re-employing Freiwald. *Id.* Nonetheless, the documents are consistent in that they both indicate that, as of October 8, 2003, Blalock had decided not to accept Freiwald back as an employee. *Id.* Regardless of whether Blalock actually considered letting Freiwald return as a Blalock Electric employee, the record clearly indicates that he ultimately decided not to do so. Since Freiwald was not treated more favorably in October 2003 than Howard was treated in June 2005, Howard cannot establish a *prima facie* case of race-based discrimination simply by pointing to Blalock Electric's internal documents concerning the termination of Freiwald's employment.

According to Blalock Electric's internal documents, Norman had been using a company-owned van in order to travel to and from work. Norman's Employee Notes, DEF 01149-DEF 01150. On September 18, 2003, Norman was told that he could no longer take the van to his home. *Id.* Upon hearing this news, Norman apparently "got mad" and left work "for the day." *Id.* He returned to his work location the next day and continued to work as a Blalock Electric employee. *Id.*

Norman testified that he could not remember leaving his job site on September 18, 2003.

33

Norman Dep. at 11. He further testified that he had later "quit" his job with Blalock Electric, and that he had not been permitted to return as a Blalock Electric employee after "quitting." *Id.* at 12. Assuming Howard's testimony that he did not "quit" his job to be true, it remains undisputed that Howard indicated that he did not want to return to the UCP site. He claims to have told Kephart that he did not feel safe returning to that work location. Pl.'s Br. 15. He does not argue that he merely left the UCP site "for the day." Thus, Howard and Norman were never similarly situated for purposes of the *prima facie* inquiry.

While the *prima facie* threshold is relatively easy for a plaintiff to meet, he or she cannot repeatedly pile one inference upon another in order to establish a *prima facie* case of discrimination. *Mackey v. Shalala*, 43 F.Supp.2d 559, 566 (D.Md. 1999). The record does not contain evidence adequate to create an inference that Blalock Electric "discharged" Howard because of his race. *O'Connor*, 517 U.S. at 312. Accordingly, Blalock Electric is entitled to summary judgment with respect to the discriminatory discharge claims asserted by Howard under Title VII, § 1981 and the PHRA.

## B.     The Retaliation Claims

Howard contends that Blalock Electric "terminated" him "in retaliation for his complaints of racial harassment and discrimination." Compl. at ¶¶ 62, 65, 68. Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for a covered employer "to discriminate against" an employee "because he [or she] has *opposed any practice* made an unlawful employment practice" by Title VII, "or because he [or she] has made a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a) (emphasis added). Similarly, the PHRA declares it to be an "unlawful discriminatory

34

practice" for an employer "to discriminate in any manner against any individual because such individual has *opposed any practice* forbidden by [the PHRA], or because such individual has made a charge, testified or assisted, *in any manner*, in any investigation, proceeding or hearing under [the PHRA]." 43 PA. STAT. § 955(d) (emphasis added). Given the similar language used in these two provisions, federal courts have consistently construed them to provide covered employees with the same degree of statutory protection. *Hubbell*, 688 F.Supp.2d at 437; *Mascioli v. Arby's Restaurant Group, Inc.*, 610 F.Supp.2d 419, 447, n. 9 (W.D.Pa. 2009); *Johnson v. Community College of Allegheny County*, 566 F.Supp.2d 405, 442, n. 13 (W.D.Pa. 2008); *Mathias v. Allegheny Valley School*, 560 F.Supp.2d 354, 359 (E.D.Pa. 2008); *McGlone v. Allegheny Valley School*, 556 F.Supp.2d 498, 503 (E.D.Pa. 2008). In *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 128 S.Ct. 1951, 1958-1961, 170 L.Ed.2d 864 (2008), the Supreme Court held that retaliation claims are cognizable under § 1981. The United States Court of Appeals for the Third Circuit recently observed that the standards applicable to retaliation claims brought under § 1981 are the same as those applicable to retaliation claims brought under Title VII. *Estate of Oliva v. New Jersey Department of Law & Public Safety*, 604 F.3d 788, 798, n. 14 (3d Cir. 2010).

The first clause of Title VII's anti-retaliation provision is known as the "opposition clause," while the second clause of that provision is known as the "participation" clause. *Hubbell*, 688 F.Supp.2d at 435. "The pendency of an EEOC charge, and a resulting 'investigation, proceeding, or hearing' under Title VII, is a prerequisite to the application of the participation clause." *Id.* at 440, citing *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003). The "discharge" of which Howard complains occurred prior to the commencement of proceedings before the EEOC and the PHRC. Consequently, his retaliation claims are based on an "opposition" theory rather than on a

"participation" theory.

In the absence of "direct evidence" of retaliation, a retaliation claim must be evaluated in accordance with the *McDonnell Douglas-Burdine* burden-shifting framework. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005). In order to establish a *prima facie* case of retaliation, Howard must show that: (1) he engaged in statutorily-protected conduct (*i.e.*, he "opposed" conduct made "unlawful" by Title VII, § 1981 and the PHRA); (2) Blalock Electric took a "materially adverse"[11] action against him; and (3) there was a causal connection between his statutorily-protected conduct and Blalock Electric's "materially adverse" action. *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 231 (3d Cir. 2007). Viewing the evidence in the light most favorable to Howard, the Court assumes that he was "discharged" by Blalock Electric. It is axiomatic that a "discharge" constitutes a "materially adverse" action. *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 711 (W.D.Pa. 2006). Therefore, the only remaining questions are whether Howard engaged in statutorily-protected conduct and whether there was a causal connection between such conduct and Blalock Electric's decision to "discharge" him.

In order to establish that he engaged in statutorily-protected conduct, Howard must show that he somehow "opposed" illegal discrimination. In *Crawford v. Metropolitan Government of Nashville & Davidson County*, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009), the Supreme Court indicated that an individual can "oppose" an unlawful act of discrimination simply by refusing to assent to it. Speaking through Justice Souter, the Supreme Court explained:

"Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we

---

[11] An action is considered to be "materially adverse" to an employee if it might have dissuaded an objectively reasonable employee from engaging in statutorily-protected conduct. *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 67-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

36

> would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons.

*Crawford*, 129 S.Ct. at 851. Because Howard *actively* attempted to have Blalock rectify the alleged "hostile work environment" at the UCP site by requesting a meeting to discuss the situation and later seeking a transfer to a different work location, his conduct easily constituted "opposition" under the standard enunciated by the Supreme Court in *Crawford*. Howard must also show that, at the time of his "opposition," he was under an objectively reasonable belief that the conduct that he was "opposing" was actually violative of Title VII. *Clark County School District v. Breeden*, 532 U.S. 268, 269-271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). Since it has already been determined that a triable issue exists as to whether Howard's work environment at the UCP site was sufficiently hostile or abusive to constitute an actionable violation of Title VII, it follows *a fortiori* that Howard can show that he acted under an objectively reasonable belief that he was "opposing" a statutory violation. Hence, Howard has established (for purposes of summary judgment) that he engaged in statutorily-protected conduct.

It remains to be determined whether Howard can establish the existence of a causal relationship between his statutorily-protected conduct and Blalock Electric's "materially adverse" action against him. Howard testified that he had spoken with Kephart on the morning of June 10, 2005, asking to be moved to a different work location. Howard Dep. at 79. According to Howard,

37

Kephart stated that Balock would contact him to discuss the matter. *Id.* Howard denied that he had expressed an intention to resign. *Id.* at 79-80. He explained that he had unsuccessfully tried to reach Blalock after returning home. *Id.* at 81. Howard stated that he had finally spoken to Balock on June 16, 2005, at which point Blalock informed him that his decision to leave the UCP site without notice had been construed as a resignation. *Id.* at 81-82.

Blalock testified that he had spoken with Howard on June 10, 2005, and that Howard had indicated that he no longer wanted to work for Blalock Electric. Blalock Dep. at 73-79. Blalock stated that Howard had not specifically requested a transfer to a different work location until the following week, and that Blalock Electric would not re-employ Howard because of a policy precluding the rehiring of an individual who had terminated his or her employment relationship with the company without providing adequate notice of his or her intention to do so. *Id.* at 95. The rehiring of Howard was apparently never given serious consideration until after the filing of his administrative complaint with the PHRC, at which point Blalock offered Howard a position in order to resolve the ongoing dispute. *Id.* at 97.

It is undisputed that Howard never signed a letter expressing an intention to resign. Kephart testified that she could not remember whether Blalock Electric had typically asked departing employees to sign letters of resignation. Kephart Dep. at 77. Under these circumstances, a reasonable trier of fact could conclude that Howard never actually resigned, and that his employment relationship with Blalock Electric was terminated because of his request for a transfer to a different work location. Given that Howard had just met with Blalock and Kephart two days earlier about race-based harassment at the UCP site, the "context" of his request for a transfer was clearly indicative of his "opposition" to the "discrimination" that he was experiencing. *Curay-Cramer v.*

38

*Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (recognizing

that "opposition to an illegal employment practice must identify the employer and the practice–if not

specifically, at least by context"). Because Howard was "discharged" almost immediately after

requesting a transfer, an inference of a retaliatory motive on the part of Blalock Electric could

certainly be drawn. *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 302 (3d Cir. 2007) ("In

certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected

activity and the adverse action may be sufficient, on its own, to establish the requisite causal

connection."). Howard has clearly established a *prima facie* case of retaliation under Title VII, §

1981 and the PHRA.

Howard's *prima facie* case of retaliation shifts the burden of production to Blalock Electric

to articulate a legitimate, nondiscriminatory reason for "discharging" Howard. *Tomasso v. Boeing

Co.*, 445 F.3d 702, 706 (3d Cir. 2006). In *Burdine*, the Supreme Court made the following

observations about the defendant's burden of production in this situation:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of
> discrimination by producing evidence that the plaintiff was rejected, or someone else
> was preferred, for a legitimate, nondiscriminatory reason. The defendant need not
> persuade the court that it was actually motivated by the proffered reasons. See
> [*Board of Trustees of Keene State College v.*] *Sweeney*, [439 U.S. 24,] 25 [(1978)].
> It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether
> it discriminated against the plaintiff. To accomplish this, the defendant must clearly
> set forth, through the introduction of admissible evidence, the reasons for the
> plaintiff's rejection. The explanation provided must be legally sufficient to justify
> a judgment for the defendant. If the defendant carries this burden of production, the
> presumption raised by the prima facie case is rebutted, and the factual inquiry
> proceeds to a new level of specificity. Placing this burden of production on the
> defendant thus serves simultaneously to meet the plaintiff's prima facie case by
> presenting a legitimate reason for the action and to frame the factual issue with
> sufficient clarity so that the plaintiff will have a full and fair opportunity to
> demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated
> by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-256 (footnotes omitted). Although Blalock Electric argues that Howard was not actually "discharged," the Court must assume that Howard was "discharged" at this stage. *Prise*, 657 F.Supp.2d at 593.

Coposky testified that Howard's performance at the UCP site had been deficient. Coposky Dep. at 11. Nonetheless, Blalock Electric does not contend that Howard was terminated for performance-related reasons. Instead, Blalock testified that Howard had not been reassigned to a different work location because of his alleged decision to "quit." Blalock Dep. at 82. Blalock explained that he generally did not reassign (or rehire) employees who had already left his company without notice. *Id.* at 95. He stated that he had later been willing to rehire Howard only for the purpose of resolving the administrative proceedings pending before the PHRC. *Id.* at 97. Although Blalock's testimony concerning Howard's alleged resignation cannot be credited (at this stage) in light of Howard's conflicting testimony, it is nevertheless sufficient to satisfy Blalock Electric's burden of production under *Burdine*.

The factual inquiry has proceeded "to a new level of specificity," thereby giving Howard "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-256. Blalock Electric essentially argues that its "reason" for "discharging" Howard was Howard's own decision to "discharge" himself. Def.'s Br. 13-14. Howard attempts to discredit this proffered reason simply by denying its factual premise. Pl.'s Br. 15-16. In other words, Howard contends that he *never* resigned, and that Blalock Electric's assertion that he did is simply false. *Id.* The respective positions of Howard and Blalock Electric are supported by conflicting deposition testimony given by Howard and Blalock. Howard Dep. at 79-82; Blalock Dep. at 73-79. A trier of fact would have

40

to *discredit* Blalock's testimony in order to credit Howard's testimony. This Court cannot make credibility-related findings when ruling on a motion for summary judgment. *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1024 (3d Cir. 2008). Viewing the evidence in the light most favorable to Howard, the Court is convinced that a reasonable trier of fact could find Blalock Electric's proffered "reason" for "discharging" Howard (*i.e.*, its explanation that Howard was not truly "discharged") to be unworthy of credence. For this reason, Blalock Electric's motion for summary judgment must be denied with respect to Howard's retaliation claims under Title VII, § 1981 and the PHRA. *Reeves*, 530 U.S. at 148 ("Thus, a plaintiff's prima facie case, combined with sufficient evidence that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

In determining that a genuine issue of material fact exists as to whether Blalock Electric "discharged" Howard in retaliation for his "opposition" to unlawful discrimination, the Court expresses no opinions concerning issues that have no direct relevance to Blalock Electric's motion for summary judgment. Since Howard contends that he *did not* resign, and that he merely wanted to be transferred to another work location, the Court has no occasion to consider whether he would have been justified in resigning had he chosen to do so. A plaintiff proceeding on a theory of "constructive discharge" must establish that his or her working conditions had become "so intolerable that a reasonable person in his [or her] position would have felt compelled to resign." *Hill v. Borough of Kutztown*, 455 F.3d 225, 232, n. 7 (3d Cir. 2006). To make such a showing, a plaintiff must establish not merely the existence of a "hostile work environment," but also that his or her resignation "qualified as a fitting response." *Suders*, 542 U.S. at 134. The instant motion for summary judgment must be denied regardless of whether Howard would have been justified in

41

resigning, since Howard did not testify that he had actually resigned. It is also worth noting that an employee has no statutory right to "oppose" unlawful discrimination in a manner that is "disruptive" or "disorderly." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 260 (4th Cir. 1998); *Hubbell*, 688 F.Supp.2d at 440-441. Although Howard had the right to "oppose" what he reasonably perceived to be unlawful discrimination, it is not clear whether, under the precise circumstances of this case, he was justified in refusing to continue working at the UCP site. Blalock Electric simply argues that Howard "quit." Def.'s Br. 15-16. Blalock testified that Howard had expressed an intention to cease his employment relationship with the entire "company." Blalock Dep. at 77. Blalock did not claim that Howard had simply refused to work at a particular job location (*i.e.*, the UCP site), nor did he state that it would not have been feasible for Blalock Electric to accommodate Howard's request for a transfer. There is a genuine factual dispute not only as to *why* Howard was "discharged," but also as to *whether* he was "discharged." Since Blalock Electric does not argue that Howard's refusal to work *at the UCP site* was the reason for his termination, the Court has no occasion to consider whether, under the circumstances of this case, such a refusal would have *itself* been a lawful reason for Blalock Electric to "discharge" Howard. At this juncture, it suffices to say that, in light of the specific positions advanced by the parties, there is a genuine issue of material fact as to whether Blalock Electric "discharged" Howard in *retaliation* for his "opposition" to unlawful discrimination.

It must be noted, however, that Howard cannot prevail at trial simply by establishing that he subjectively intended to remain an employee of Blalock Electric when he spoke with Kephart on June 10, 2005. Since the dispositive question is whether Blalock Electric *discriminated* against Howard because of his statutorily-protected activity, Howard cannot prevail simply by showing that

42

Blalock and Kephart were "wrong or mistaken" about what he intended. *Fuentes*, 32 F.3d at 765. Instead, he must establish that Blalock's decision to "discharge" him was motivated by a *retaliatory animus*. *Venter v. Potter*, 694 F.Supp.2d 412, 429-430 (W.D.Pa. 2010).

## VI. CONCLUSION

When viewed in the light most favorable to Howard, the evidence suggests that Howard's work environment at the UCP site was sufficiently hostile or abusive to be violative of Title VII, § 1981 and the PHRA, and that Blalock Electric was negligent in failing to appropriately remedy the situation. Blalock Electric's motion for summary judgment will be denied with respect to Counts I, II and III of Howard's complaint. Compl. at ¶¶ 43-51. Although some of Howard's co-workers may have engaged in racially-motivated harassment, there is no evidence that Blalock Electric "discharged" Howard because of his race. Therefore, the motion for summary judgment will be granted with respect to Counts IV, V and VI. *Id.* at ¶¶ 52-60. If Howard's testimony is believed, a reasonable trier of fact could conclude that he was "discharged" by Blalock Electric in retaliation for his "opposition" to unlawful discrimination. Accordingly, Blalock Electric's motion for summary judgment will be denied with respect to Counts VII, VIII and IX. *Id.* at ¶¶ 61-69. An appropriate order follows.

AND NOW, this 21st day of September, 2010, this matter coming before the Court on the Motion for Summary Judgment filed by the Defendant (*Document No. 23*), IT IS HEREBY ORDERED that the Motion for Summary Judgment is **GRANTED** with respect to Counts IV, V and VI of the Plaintiff's Complaint and **DENIED** with respect to Counts I, II, III, VII, VIII and IX of the Complaint.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

cc:   All counsel of record